[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14870
Non-Argument Calendar
_____

Agency No. A209-239-683

QUANXING YANG,

Petitioner,

versus

U.S. ATTORNEY,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 24, 2018)

Before WILSON, JORDAN, and ANDERSON, Circuit Judges.

PER CURIAM:

Quanxing Yang seeks review of a final order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for asylum pursuant to the Immigration and Nationality Act ("INA") § 208(a), 8 U.S.C. § 1158(a), withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). The IJ and BIA determined that Yang was ineligible for asylum because he was firmly resettled in Peru, and they found that he failed to meet his burden for withholding of removal or CAT relief. On appeal, Yang argues that he was not firmly resettled in Peru, that he has a well-founded fear of persecution in China, and that he met the burdens for withholding of removal and CAT relief.

## I.    STANDARDS

We review only the decision of the BIA, unless the BIA adopts the IJ's decision. Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). When the BIA explicitly agrees with the findings of the IJ, we will review both decisions to the extent of the agreement. See Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010). Here, the BIA did not adopt the IJ's decision but agreed with the IJ's conclusions regarding Yang's firm resettlement in Peru, as well as his failure to

2

meet the burdens for withholding of removal and CAT relief. Thus, we review both decisions to that extent. See id.

We review legal issues presented in a petition for review de novo. Id. We review factual findings under the substantial evidence test. Adefemi v. Ashcroft, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc). Under that test, "[w]e 'must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 1027 (quoting Najjar, 257 F.3d at 1283–84). We view the evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision. Id. Factual findings "may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

## II.    BACKGOUND

Yang is a native and citizen of China. In 1991, when Yang was 13, he and his family left China for Peru. Yang attended school and then worked as a businessman in Peru until entering the United States in 2016. According to Yang, he left Peru because he was targeted by the gangs there due to the fact that he is Chinese. In his credible fear interview, Yang described several incidents in which gang members in Peru robbed him or his home or threatened him. Yang did not report these incidents to the police because he believed that the gangs and the Peru

3

police were working together. Yang stated that, on one occasion, policemen "blackmailed" him "about [his] personal ID [card]" in order to extort money from him. Yang also testified that the gang members threatened to kill him if he reported any of their crimes to the police. Regarding his legal status in Peru, Yang stated in his credible fear interview that he received permission from Peru to remain there legally. When asked if his status in Peru was as a permanent resident or a long term resident, Yang stated, "It is a long term residence." The interviewer then asked Yang when his residence in Peru would expire. Yang replied, "2020."

At the merits hearing before the IJ, Yang reiterated his fear of returning to Peru due to the gangs. Regarding his status there, he testified that he had "a permanent resident card from Peru" and confirmed that he had lived there for twenty-five years before entering the United States. Yang's attorney tried to clarify Yang's statements during his credible fear interview regarding his Peru status expiring in 2020. Yang's attorney asked, "[I]n your prior interview with the asylum officer, you had said that you had a long-term residence but not a permanent residence, and that your status actually would end at the year 2020. Do you recall that?" Yang replied, "Yeah. I remember. I think they're all the same, right? Long-term and permanent. What is the difference?" After a short exchange between the IJ and Yang's counsel, Yang supplemented his answer: "Can I add

4

something—for the previous question? The ID card is an alien card from the government. You had to pay a fee each year. Otherwise, it would be revoked."

Yang also testified about a trip that he took to China from Peru in 2007. During this trip, Yang attended several underground church gatherings. Police raided one of these gatherings, arresting Yang and the other attendees. The police pushed, shoved, and kicked Yang and the other attendees during the arrest in order to make them move faster. Yang was detained for eleven days and interrogated several times. According to Yang, the interrogations were noisy and took place at night, making it difficult for him to sleep. Yang's parents were able to bribe officials to release him. Upon his release, police warned Yang that he risked being jailed and separated from his family if he continued to attend underground religious meetings. Additionally, in the days following Yang's release, the police went to his home in search of religious materials. Yang testified that he did not suffer any major injuries from the detention. He nevertheless fears that if he returns to China, he will again be arrested for practicing his religion. He testified that he sought asylum in the United States because it is "the country of religious freedom" and all of his family members live here.

Although the IJ found Yang credible, the IJ denied Yang's petition for asylum, withholding of removal, and CAT relief. The IJ first found that Yang was firmly resettled in Peru and concluded that Yang was therefore ineligible for

asylum. The IJ further concluded that, even if Yang were not statutorily barred from seeking asylum, Yang failed to show that he was entitled to asylum under the INA. The IJ stated that he believed that Yang was not seeking asylum from Peru. The IJ then found that Yang's allegations regarding his eleven-day detention in China did not rise to the level of past persecution. Additionally, the IJ found that Yang's fear of future persecution in China based on his religion was not objectively reasonable and that Yang failed to establish that it was more likely than not that he would be tortured upon return to China.

The BIA affirmed the IJ's denial of Yang's petition. The BIA first agreed with the IJ's determination that Yang was ineligible for asylum due to his firm resettlement in Peru. The BIA then affirmed the IJ's conclusion that Yang failed to establish that he was entitled to withholding of removal or relief under CAT. The BIA also noted that the record was a bit inconsistent regarding whether Yang was seeking asylum from Peru as well as from China. Nevertheless, the BIA concluded that any error regarding the IJ's failure to address Yang's fear of returning to Peru is harmless because Yang was ordered removed to China.

## III.　DISCUSSION

The Attorney General has the authority to grant asylum to an alien who meets the INA's definition of "refugee." INA § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A). A refugee is:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail him or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). However, an applicant is statutorily ineligible for asylum if he was "firmly resettled in another country prior to arriving in the United States." INA § 208(b)(2)(A)(vi), 8 U.S.C. § 1158(b)(2)(A)(vi). "An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement . . . ." 8 C.F.R. § 1208.15. An exception to this rule exists if the alien can show either (1) that his entry into that country "was a necessary consequence" of his flight from persecution, he only remained there long enough to arrange further travel, and he did not establish significant ties to that country, or (2) that the conditions of his residency in that country were "so substantially and consciously restricted by the authority of the country" that he was not in fact resettled. Id. § 1208.15(a)–(b).

An alien is entitled to withholding of removal if he can show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The applicant must show that it is more

7

likely than not that he will be persecuted or tortured upon returning to his country. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005).

Persecution is an "extreme concept," requiring more than mere harassment or "a few isolated incidents of verbal harassment or intimidation." Id. at 1231 (quoting Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000)). For example, in Djonda v. United States Attorney General, 514 F.3d 1168 (11th Cir. 2008), we held that the evidence did not compel a conclusion that the petitioner had suffered past persecution. Id. at 1174. In that case, the petitioner was detained in a small cell with twelve other people for thirty-six hours, unable to sleep, beaten multiple times, including once with a belt, forced to drink a "very dirty liquid" and eat something "very bad," and hospitalized for two days after the detention. Id. at 1171. Additionally, in Kazemzadeh v. United States Attorney General, 577 F.3d 1341 (11th Cir. 2009), we held that a four-day detention, including a five-hour interrogation and beating, accompanied by post-incarceration monitoring, did not compel a finding that the petitioner had suffered past persecution. Id. at 1353–54.

On the other hand, we have held that a petitioner suffered past persecution on account of his religion where officials interrupted a church service in the petitioner's home, confiscated bibles, detained the petitioner for seven days, slapped him, threatened to beat him with a bar, and handcuffed him to an iron bar overnight in the rain, which caused a high fever and sore throat. Shi v. U.S. Att'y

8

Gen., 707 F.3d 1231, 1235–37 (11th Cir. 2013). In concluding that Shi had suffered past persecution, we distinguished the facts of Shi from those in Djonda, noting that Djonda involved less than a weeklong detention, did not involve the interruption of a church service or confiscation of religious material, and did not involve as "singularly cruel a tactic" as handcuffing the petitioner to a bar outside in the rain overnight. Id. at 1239. We stated that "perhaps" the most important fact in compelling the finding of past persecution in Shi was the fact that Shi was handcuffed to the bar. Id. at 1237. We noted that Shi developed a high fever and sore throat and was only released after he did not recover and the police feared that he would die in custody. Id.

We affirm the denial of Yang's petition for asylum and withholding of removal. First, substantial evidence supports the finding that, after leaving China, Yang firmly resettled in Peru before entering the United States. According to Yang's own testimony, he lived, attended school, and worked as a businessman in Peru for twenty-five years. Regarding his legal status there, it is true that Yang described his status as long term rather than permanent in his credible fear interview; he also answered the interviewer's question regarding when his status would expire by saying "2020." But at the hearing before the IJ, Yang testified that he had "a permanent resident card from Peru." When asked about his contradictory answer during his credible fear interview, Yang explained that he does not think

that there is a difference between long term and permanent residence. Yang also stated that his status does "expire" every year; however, he can pay a fee each year to renew his card. Given the totality of Yang's testimony regarding his status in Peru, substantial evidence supports the finding that Yang obtained an offer of permanent residence in Peru. And Yang does not offer evidence that the government in Peru severely restricted his status such that he was not in fact firmly resettled there. Accordingly, the IJ and BIA correctly concluded that Yang is statutorily barred from seeking asylum from China.

Regarding Yang's claims for withholding of removal to China, substantial evidence supports the IJ's and BIA's conclusion that Yang failed to show that it is more likely than not that he will be persecuted upon returning to China. First, substantial evidence supports the finding that Yang's eleven-day detention does not amount to past persecution. Although Yang testified that the police were rough with him and the other attendees during the arrest, Yang testified that he only suffered minor injuries from the incident. Regarding the fact that Yang was interrogated and kept awake at night by the noisy interrogations, this Court has held that seemingly more severe detentions that involved multiple beatings and interrogations did not compel a finding of past persecution. See Djonda, 514 F.3d at 1174 (holding that a thirty-six-hour detention, during which the petitioner was beaten multiple times, resulting in a two-day hospitalization, did not compel the

10

conclusion that the petitioner suffered persecution); Kazemzadeh, 577 F.3d at 1353 (holding that a four-day detention, during which the petitioner was interrogated and beaten, did not compel the conclusion that the petitioner suffered persecution). Given that Yang was not subjected to severe interrogation tactics, was not seriously injured, and was allowed to leave China without incident after his release, the record in this case does not compel a finding of past persecution. Cf. Shi, 707 F.3d at 1235–37 (holding that the record compelled a finding of past persecution where the petitioner was detained for seven days, handcuffed to an iron bar overnight in the rain, and only released when the police feared that the petitioner would die in custody).

Likewise, the record does not compel a finding that it is more likely than not that Yang would be persecuted on account of his religion if he returned to China. In making this determination, the IJ relied on several country reports regarding religious liberty in China. See Djonda, 514 F.3d at 1175 ("[T]he Board is 'entitled to rely heavily on' country reports." (quoting Reyes–Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004))). Some of these reports note that, in certain areas in China, local authorities allow or at least do not interfere with the activities of unregistered religious groups. The IJ also noted that, despite his participation in an underground religious service, Yang was able to leave China without incident after his eleven-day detention and that it has been many years since Yang was

detained. Given this evidence, the record does not compel the conclusion that Yang would more likely than not suffer hardships that amount to persecution on account of his religion upon his return to China.

We also affirm the IJ's and BIA's conclusion that Yang failed to establish that he is entitled to relief under CAT. To obtain CAT relief, an applicant must show that it is more likely than not that a government official or person acting in an official capacity will torture him or aid or acquiesce in his torture if he is removed to the proposed country. See Najjar, 257 F.3d at 1303. Given that substantial evidence supports the determination that it is not more likely than not that Yang will suffer persecution upon his return to China, substantial evidence also supports the IJ's and BIA's determination that Yang is not more likely than not to be tortured by the Chinese government upon his return to China.

Finally, Yang argues that the IJ erred by failing to analyze whether Yang established a well-founded fear of persecution if he returned to Peru. We agree with the BIA's conclusion that any error in this regard is harmless because the IJ ordered that Yang be removed to China, not Peru. For all of these reasons, we deny Yang's petition.

**PETITION DENIED.**

12